I will turn to the second case on our calendar, N. K. et al. v. Abbott Laboratories. Mr. Finns, go ahead. Good morning, Your Honors. Good afternoon, Your Honors. My name is Stu Finns, and I represent the Plaintiff Appellant. There are four undisputed important facts that I'd like to focus the Court's attention upon. One, the infant child, and I'll refer to him as N. K., was exposed to high doses of Depakote throughout the gestational period. Two, Depakote is a known teratogen, a substance that causes birth defects. Three, and very important, general causation is not disputed. That is, that Depakote causes many of the birth defects suffered by N. K. And four, all genetic tests that were performed were negative for genetic cause of N. K.'s birth defects. Now, the policy, Your Honors, behind 702 is to exclude unreliable expert witness testimony that is based upon junk science. Here we have two highly qualified specific causation witnesses employing an accepted methodology. First, Dr. Lewis. Dr. Lewis was N. K.'s treating pediatrician, a diagnostician, from day 12 of life to the present day. And since Dr. Lewis' opinions on specific causation were formed during her treatment of N. K., there is built-in inherent reliability as to her causation opinion. That made her an expert because she was his treating physician for that length of time? She is — we do believe she's an expert, but we believe that — Is that what you're saying? She got there through a methodology that is accepted by pediatricians with regard to diagnosing causation. And that's what the role of a pediatrician is. But on top of the — That is a differential diagnosis. That — yes, Your Honor. Yes, Your Honor, that is a differential diagnosis. And she employed the very same type of diagnosis, the differential diagnosis, that pediatricians employ every day in this state and throughout this nation. And that is the accepted methodology. And the part of the methodology is to try, at least in the context of this case, as I understand it, but correct me if I'm wrong, to rule out genetic causes. Absolutely. And what she did — So in her deposition, she is asked the question, are you able to rule out a genetic underlying cause of N.K.'s cognitive and physical disabilities? Her answer, the answer is no. Well, there was a lot of questions before and after that, Judge, but let me answer that directly. That was the question. Yes. Objection, objection, objection. I guess the answer is no. The way she ruled out genetic causes was that she received the documents from the Columbia-Presbyterian genetic team. That's the team — She says she didn't rule out. Well, she did, Your Honor. What she said, and she was pressed on that question, and it's the first time that she ever gave testimony by deposition or maybe the second time. And when she was pressed, what she was saying, in essence, was she's not a geneticist, so she doesn't know if there's some unknown test that may have some unknown cause. But what she did know — The entire reason to have or to undertake a differential diagnosis? The purpose of the differential diagnosis is to rule out what's obvious, the obvious causes. Here, Your Honor, the obvious causes were either genetics or Depakote exposure of high doses for long duration. She spoke with a geneticist. She received the documents from the geneticist. Every single test that genetics ran were negative, and she used that. Now, does that make it 100 percent? Only by a preponderance of the evidence, Judge, must we come forward and show that her testimony would be reliable. Counsel, were you counsel below? Yes, Your Honor. You were. So I was curious, why didn't you get another expert witness for that Daubert hearing? Instead of relying on the treating physician. It wouldn't be hard, right? There are a lot of experts in the field. Actually, Your Honor, we requested a Daubert hearing, and we were denied the opportunity to have a Daubert hearing to bring the doctors in to testify, which we thought would be appropriate so the doctors could explain. I thought you had a Daubert on the papers. There was a motion made. We requested of the magistrate judge for a Daubert hearing to bring in Dr. Lewis so that questions could be asked of her and answers could be given so that she could explain what her differential diagnosis was and what the basis of it was, and we were denied that opportunity, Your Honor. What she employed, well, first we say that she's really not subject to 702. She's subject to 701 as a treating doctor because there's inherent reliability built into that. But if Your Honors believe that 702 applies, she is qualified because, number one, she's a diagnostician, which is a pediatrician. She's Harvard educated. She was the chief resident at Columbia Presbyterian. She's board certified and an assistant professor in pediatrics. But more important than that, her differential diagnosis, Depakote versus genetics, the methodology that she employed is not disputed by the defendant. And therefore, Your Honors, any claim deficiency in her analysis during her differential diagnosis would go to the weight and not to the admissibility. Your argument, your real argument, is that even if she had completely screwed up the diagnosis and had failed, wittingly or not, to rule out genetic causes and admitted that, that would go not to the admissibility but to the weight, so she could be cross-examined on that. If she's employing an accepted and proper methodology, then I believe the testimony is admissible and vigorous cross-examination can flush out any issues there forward. Is it enough to exclude a proposed expert that that person does not exhibit sufficient familiarity with the methodology here? Yes, of course, if they were not familiar with the methodology. But here, she uses the methodology of differential diagnosis every day in her professional life. And she's used it before N.K.'s birth, for N.K.'s diagnosis causation, and thereafter. So she is a diagnostician, and that's what a pediatrician does. Let me answer another question Your Honor asked before it slips my mind, and that is, why didn't we also have another doctor? We did. And that was a teratologist, Dr. Stodgill. Dr. Stodgill has spent his- I didn't say, I know you had two doctors. I wondered why you didn't have two experts. Well, because we thought it would be more appropriate and more important to have a treating doctor who has done nothing with her life but treat patients. She's not an expert out there. She doesn't testify. She is a diagnostician. She's devoted her entire life to diagnosing children and treating children after their diagnosis. And as long as the methodology that's employed is an accepted methodology, which it is, and there's no dispute that the methodology employed is a proper and accepted methodology, then the jury should make that determination. And that's why we have vigorous cross-examination. If there's some holes- All right, finish this sentence. If there are some holes, Your Honor, if there are some holes, those holes could be brought out during cross-examination, and then it's up to the jury to make that determination. But if there are qualifications as a diagnostician, and if the methodology employed is an appropriate and proper methodology, we have met our burden by a preponderance of the evidence, by 51% that there is credibility to this particular doctor. And you think that on that basis, you're entitled to have her testify under Rule 702 as an expert? Yes, Your Honor, and if I could, Your Honor- All right, let me back up, because you had invoked also Section 701, and I want to make sure I have a clear notion of what your argument is. Did you put before the magistrate judge the possibility of having her testify as a so-called lay witness? Yes, Your Honor. You did? Yes. And what was the ruling on that? The ruling was that she does not qualify as a lay witness, she does not qualify as an expert witness, nor does our teratologist who studied Depakote for 20 years and has devoted his life to the study of this particular drug. The magistrate judge found that he does not qualify either. If I may, Your Honor- Now, the lay witness rule, of course, indicates that the opinion that would be rendered by the person giving testimony would not be based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Yes, Your Honor. So what exactly would be the basis of her testimony in the 701? The basis of her testimony is factually driven, because what she did is she reviewed the dose and duration- this is how she arrived at her differential diagnosis- she reviewed the dose and duration of the in utero exposure, which was high doses for the entire gestation. She reviewed all of the Columbia Presbyterian medical records to establish what the constellation of birth defects were. She reviewed the genetic testing records, which all were negative. She reviewed the neuropsychological records of N.K. with regard to his brain damage. She conducted her differential diagnosis by ruling all of those items out, Your Honor. She then ruled out genetics because there was not a single- and Your Honor, let me raise this, if I may. The defense- Why did she rule out genetics? She did rule out genetics, Your Honor. You were saying- Yes. She ruled out genetics two ways. Initially, the first month of life, N.K., when he was born, obviously was deformed. The team at Columbia Presbyterian did a battery of genetic tests on him. They chose the tests, not Dr. Lewis, not anybody else. The team at Columbia chose them. Those included genetic tests. All of the genetic tests, correct. And every single genetic test that was performed came back negative. Did they recommend additional genetic testing? Judge, I was going to get to that, and I thank you for asking that question. The additional- There's only a single genetic condition that was suggested, and that was nine years after his birth and nine years after the diagnosis. And what Dr. Lewis did as a good doctor, and that was a condition called NF1, and what she did was she said, well, maybe NF1 has something to do with it. There were some café au lait spots on him. Now, let me send him out to an ophthalmologist, because if he had NF1, a marker for NF1 would be an ophthalmological problem with your eye. So she sent him to an ophthalmologist. The ophthalmologist performed an examination of N.F.K. The determination by the ophthalmologist was that there was no marker for NF1, and therefore further genetic testing was not warranted. Not only would it be putting this poor child through something that is not warranted, but it would be a waste of resources, time, and energy, and he was not a candidate for it. So that was ruled out, and once again, it is our position- But I also thought that there was another issue, which is that there were advances in genetic testing. Let me address that, Judge. Is that also another issue? Okay. It's an issue raised by the defense. They have not identified a single genetic test or a single genetic condition or a single place that would perform this fanciful genetic test. So what is a plaintiff's litigant supposed to do? Run out for every possible genetic test for any possible condition? If there was a genetic test that the defense- We're not necessarily holding you to parental standards or medical standards. It's not a question of what you would do, but what the record shows. As we discussed a moment ago, in 2005, the first round of genetic tests came back negative. Correct. The geneticists recommended that NK be reevaluated in six months. Isn't that right? There is a note with regard to a six-month, yes. So the answer is yes. Now, the next question, did NK ever receive those additional genetic tests? We're not suggesting that you should be running around P&S hassling people. We're asking whether the appropriate caretakers and doctors did this. Were there any other additional genetic tests? No, because it was Dr. Lewis's opinion, after she performed her differential diagnosis and reviewed the existing genetic tests, that the cause of his condition was Depakote. And once again, Judge- Hold on. I just want to get certain questions before you and answer them. You've answered them so far. Has NK received any genetic testing since 2005? No, Judge. No, and not a single test, specific test, has ever been recommended. Let me ask you an uncomplicated layman's question. Yes. How can one rule out genetic defects as the cause of NK's abnormalities, given the fact that there's been no genetic testing since 2005? The question, Judge, then really is what is the standard? Is NK supposed to go out every year and have a new genetic test performed or find out are there new genetic tests that just came out that he should run to the geneticist? Once the doctor employs a proper methodology at the time- He could walk to the geneticist. It would be difficult for him, but yes, Judge. You could walk to the geneticist. Why is it difficult? That would be imposing- Why is it difficult? Why is it difficult? Well, is the court suggesting that an infant and an infant's parents should do research to determine- No, no, I'm not suggesting anything. Then I misunderstood, Your Honor. He's under the care of Dr. Lewis, right? Yes, Your Honor. Why doesn't somebody follow up on the suggestion of further genetic testing? There was no specific type of genetic testing, and Dr. Lewis already made her determination. So let's assume, Your Honor, there were other genetic tests. Once again, the methodology was filed that goes to the weight, and that's good cross-examination. Fundamentally, your argument is that all of these questions are irrelevant to the admissibility of the report and to her testimony. She could be cross-examined to death on the issue of what she did or didn't do with respect to further genetic testing. No, Your Honor. I think once you are- I'm wrong. That's not your fundamental argument. It's not my fundamental argument. Absolutely not. I think once- I was trying to help you, but I missed your big chance. I think- This was your chance. Judge, I think once- The weaker argument than the one- I think once the doctor has the qualifications and once you use the appropriate methodology, by the power of the evidence, the obligation under 702, if we're looking at 702, has been fulfilled. And yes, then at that point, Your Honor, once you meet that threshold, then it goes to the jury and it goes to credibility. Did you invoke the prospect of you yourself running around P&S? That's because I've been with the family from the beginning, Judge. That's what I was going to ask. You've been involved in this since when? Since the inception, Judge. Since the inception. Yes. So you, as a lawyer, knew that there had been a recommendation that there be further genetic reevaluation. Judge, when I say the inception, maybe it was four years ago, not the inception of the birth of NK, which was 2005. So I apologize. So we got involved when he was- And since that time, four or five years ago, whatever it was, you haven't thought to recommend to your clients further genetic testing? Judge- I'm not- No, I have not thought, and I don't think it would be appropriate to recommend further genetic testing, nor do I think to meet the standard under 702 of preponderance of the evidence, it is required that he undergo further genetic testing. And once again, Judge, I think Dr. Lewis fulfilled that obligation. Can I turn to Dr. Stodgill just for a moment? You've had your treat. You'll have some more time. Thank you, Judge. I've given you ten more minutes. I know that. And we appreciate it very much. I appreciate the time. Thank you, Judge. You have the last time at bat. Don't worry. Mr. McCauley. Thank you, Your Honor. Your Honor, may it please the Court. John McCauley on behalf of the Appellee Abbott Laboratories. Your Honor, it would be-I'd start off by saying far from an abuse of discretion, it's clear that Magistrate Judge Reyes did a thorough and painstaking job- So set aside. This is a big set aside that I'm going to ask you to go with me on or accept, but set aside the standard of review. The rule that I think you would be proposing is one where, at least in the context of differential diagnosis, before a doctor or anybody else can even be qualified minimally as an expert, they've got to show that they have excluded every possible genetic cause. Is that the rule? No. So what's the rule? The rule is, at least in this case, is that the person who is purporting to rule out the genetic causes  and there were several noted by Dr. Yeboah, the only geneticist in this case who hasn't testified. Where does he note those causes that Dr. Lewis at least failed to exclude? Well, Dr. Lewis testified, as Your Honor pointed out already, so I won't belabor it, she already testified that she would have to say she did not rule out genetic causes, but more specifically, at A1362 in the appendix, which is her deposition, she was asked whether the tests that Dr. Yeboah did in 2005 ruled out the very specific syndromes that he was looking for. They had names to them, Fanconi, DeGeorge, Opitz, and there was another one called Pierre Robin. And when she was asked at her deposition whether she knew whether those tests had in fact ruled out those syndromes that had been identified by the geneticist, she conceded that she did not. And she said in a very candid way, this is quoting, you would have to ask the geneticist. This is on page 78 of her deposition. She was not able to do that. And that's why we have a situation here, not where one expert is coming in and saying, Judge, I believe these tests conclusively rule out those syndromes, and we have another expert saying, Judge, those tests do not rule out those syndromes, and then you have a battle of the experts, and then you have all of those important cross-examination tools that the good skilled trialers like Mr. Fins brings to bear. You're saying that at least with respect to the Fanconi and Opitz tests, she was aware of that and did not rule that out. Right. And as you saw in the record, Your Honor, Opitz is remarkably similar to the constellation of syndromes that this child had. And then we have, Your Honor, in addition to those facts, the fact that's already been noted, that Dr. Yeboah asked to see him back in six months, and that multiple doctors, including three neurologists who saw the child, mindful of the testing, knowing of the testing that Dr. Yeboah had done, suggested that coming back to have another look in light of advances in the science would be a good idea. That was never done. Dr. Lewis certainly didn't do it. Does that mean that she's not an expert in this area? I mean, obviously she, in the context of the deposition and the report, has some significant familiarity with the area of differential diagnosis. Or does that mean that she could be successfully cross-examined by the likes of you on what she failed to do? Well, successful cross-examination can be an exception that swallows the whole rule of Daubert. The trial judge has the obligation to make sure that the evidence is reliable. The Daubert, the Kumho tires, puts that squarely on the trial judge's plate to make sure there's an indicia of reliability. Yes, cross-examination and those tools the trial lawyers bring to bear are important considerations, but that's why there's this, and I know you didn't want me to go to this deferential standard, but that's why you have that deferential standard. That's for the trial judge to figure out, to achieve that balance between is this reliable or should I let it go to trial and cross-examination. This is not something, with all due respect, that the appellate court should be second-guessing, except in egregious cases where there's, as the standard says, a manifestly erroneous decision. Here, I think the judge is far from that. So, Your Honor, we look at what Magistrate Judge Reyes was confronted with, and he had a geneticist who admitted that she understood that she had to rule out genetics, admitted that she had not ruled out genetics, admitted that she did not know whether the tests that had been prescribed by Dr. Yoboa ruled out genetics or ruled out the specific syndromes, never followed up on Dr. Yoboa's request for follow-up in six months, and so, Your Honor, we have a situation where it's clear that there was an insufficient scientific basis. You seem to give some attention to the fact that Dr. Lewis had assumed the role of a paid litigation expert for the plaintiff, or at least you bring that to our attention, including the amount of compensation that she was to be paid. What are we to make of that? What's the significance of the fact that counsel had retained Dr. Lewis as an expert witness? Well, Your Honor, I think when she was retained as an expert, she crossed from the Rule 26A2 status of a non-retained treating doctor expert who can testify, as Your Honor pointed out, to factual issues, into a full-blown expert that certainly is subject to 702 and Dawbert analysis. So if I could, this may not be terribly relevant in the last analysis, but I'm just curious about what your position is. I take it it's your view that if she had not assumed the role of a paid litigation expert for the plaintiff, that the possibility that the judge would have admitted her testimony would have been enhanced. She would have been better off being simply presented as a fact witness. Well, I don't think that would have helped in this case for her because she's going beyond what a fact witness, a precipient treating doctor, can do. As Your Honor pointed out, Rule 701 was amended in 2000 just to cover this purpose. Witness testimony that's factual in nature, a precipient treating doctor fact witness, can offer a fact opinion or a lay opinion, as they call it, as long as it's not based on scientific, technical, or other specialized knowledge. That's the problem here. Plainly, this is— The best chance was 702, not 701. She's got to survive 702, and that's in the Davids case, which came out of the Southern District, and also in the Amorgianos case, which this Court decided, where they struck and affirmed the striking of a treating doctor and applied the 702 standard. There's not a two-tiered rule for expert evidence. You've got to pass muster under 702 if you're offering what's scientific expert opinion. Certainly doctors can say, a guy came in with a broken leg who had been in a car accident, and so I treated his broken leg secondary to the car accident. Can you make this other subsidiary argument that in order to be qualified, at least in the context of this case, both Dr. Lewis and Dr. Stajil needed to be— well, Dr. Stajil needed to be a medical doctor? Well, there's authority for the idea that it's an appropriate consideration. It's not a bright-line rule for sure. I misunderstood. Okay. No, it's not a bright-line rule. The Plourd case, which came out of this Court— I understand the problems with the bright-line rule. Right, but what Plourd teaches, I think, is that it is appropriate for the trial judge to consider that in his evaluation of whether— If Dr. Stajil had had experience with human beings as opposed to animals, would you have had a real basis to object? I think one of your main arguments is that he's never treated human beings. He's really focused on animals. Well, that's one of a number of factors that weighed in Judge Rea's decision that he was unqualified, but it was more than that. With Dr. Stajil, it was plain that he was relying on Dr. Lewis to do the rule-out. In fact, the plaintiffs said— This is what the plaintiffs told Judge Rea below. This is at page 882 in the record, Your Honor, and this is an excerpt from their opposition. I know I'm out of time, but I want to take time to answer the Court's question. Go ahead. In their opposition papers to our motion to exclude Dr. Stajil, they said as follows. More fundamentally, whereas the toxicologist implored—that's the case we were just talking about— claimed to have ruled out all of the competing causes of the plaintiff's symptoms, Dr. Stajil was not charged with ruling out any potential causes for N.K.'s physical conditions. The rule-out process in N.K.'s case was performed by N.K.'s treating pediatrician, Dr. Lewis. They go on to say Dr. Stajil's role was to confirm the rule-in, not the rule-out, the rule-in of in utero valproate exposure as a cause of N.K.'s congenital abnormalities. That is a fair and accurate statement of what Dr. Stajil's role was. He wasn't there to rule anything out. He was there to identify the general cause rule-ins of what were the symptoms and syndromes that he could rule in with respect to valproate exposure, and that's what he did. He didn't do any rule-out, and to the extent he did or says he did, it was in reliance on whatever Dr. Lewis did, and he assumed it had been ruled out. I don't want to leave the Court with any open questions. So I'll ask you a question. All right. Thank you, Your Honor. Let's go back to Dr. Lewis's diagnostic techniques for a moment. I'm not quite sure I fully understand why those techniques for deciding on treatment weren't adequate to establish causation in a courtroom. An example given a moment ago by you, I think, in your colloquy with Judge Lurie, was a doctor who treated somebody with a broken leg and could testify as to what caused the broken leg. How is this different from that? Well, Your Honor, this is different because there is no evidence. In fact, if you look at Dr. Lewis's deposition, she said that the etiology, this is why it wasn't that important to her, this was by way of her explaining why nowhere in 12 years in her records did she say this child had valproate embryopathy or that she had ruled out genetics. She said the etiology of his condition was immaterial to my treatment of the child, and that makes perfect sense. You don't treat a child with cleft palate any differently because it was a function of depakote exposure versus a genetic syndrome. You don't treat hypospadias any differently, and you certainly don't treat developmental delay any differently. So it was immaterial to her treatment. So this is not one of those situations where a doctor says, I did this because of that. I did this because I had to figure out where this was coming from and I treated. It doesn't go that far for her in this case. Just to belabor or ask one other question, if Dr. Lewis had come back and undertaken to do these two other tests, Opitz and Franconi, I think it was, Franconi, and those are the two only other identified tests that had not been undertaken, and ruled genetic causes out, would it then have been an abusive discretion for Judge Reyes to exclude her testimony and bar her or deem her not qualified as an expert? I think Judge Reyes was clearly correct in ruling that neither Dr. . . . Right. I understand that. I'm going to get to that. I believe that Dr. Reyes, I mean, Judge Reyes, I don't know if that's a promotion or a demotion, but . . . It's on your field. I suppose. I don't believe that Magistrate Judge Reyes was incorrect in finding that neither of these experts, as sterling as their credentials are in their own particular fields, was unqualified to do what they were being asked to do in this case. We have Dr. Lewis saying she doesn't really know what tests you would do, and she doesn't do those tests herself. So your hypothetical assumes a lot. It essentially is assuming her into the role of someone who's an expert in genetics, which she's not. If she were an expert in genetics . . . He's asking if she would become an expert if she did those only remaining tests. Well, I would say . . . That may qualify her. Well, I would say that that would be a closer call, obviously. So the question then would be, given the fact that Dr. Yeboah wanted to see the child back and four other doctors said, we think additional testing is indicated . . . So I'm trying to extract what your position is and not . . . Yeah. Because every time we think we're at the end of the road, you extend the road. So if she had done those two tests and asked for more genetic testing, when would it end? That is a good question for someone who is an expert in genetics. There was one available in this case, Dr. Yeboah, and nobody asked him. She said, you have to ask the geneticists. That's what she said in her deposition. She never did. The only time she talked to Dr. Yeboah, he said, I don't think it's Valproate syndrome. Fundamentally, your argument, your point, is that a geneticist is the person who can be qualified as an expert in this case. I think I wouldn't put it so hard and fast as you do, but I think a geneticist would have gotten them much further to the goal line of having a credible, reliable expert opinion for a jury to consider. But when you talk about putting the pediatrician up, who's been caring for the child for 12 years, that pediatrician has, I think, an extra level of credibility with the jury. I think, if anything, you have to be extra careful with pediatricians. Jurors know and love their pediatricians, and they trust them. And so if somebody is going to get on the stand and offer a scientific opinion, I think pediatricians have to be subject to the same rules as anyone else. Thank you very much. Thank you very much, Your Honor. Ms. Fins was reserved two minutes. She's a two-minute sister. Your Honors, you don't have to rule out 100% of genetic causes. As long as you are relying upon the test results, which Dr. Lewis did of the barrier of tests selected by the geneticist team at Columbia Presbyterian, she has fulfilled her obligation and her differential diagnosis, although even if shaky, and we don't say it is shaky, but even if shaky, is admissible and subject to cross-examination. All I think the magistrate was saying is that she had to know what to rule out, and she didn't. She did, Your Honor, with all due respect. She knew that, first of all, she knew there was high doses of Depakote. This is not some left-field case. You're talking about genetic rule-out. Yes, but, Judge, part of the genetic rule-out is that she knew that Depakote was a potent teratogen that causes the birth defects that N.K. had. N.K. went through a battery of genetic tests that ruled out every genetic cause that the geneticist decided to test him for. This is not some left-field causation issue. She certainly was qualified. If I can turn just for a moment to Dr. Stodgill. We believe that Dr. Stodgill independently is qualified and employed the proper methodology. I won't go through his qualifications, Your Honor, as you have him. He's been a teratologist for 26 years. This is his life study. He studied the drug Depakote before he ever knew about this case. That's been his life, and he studied animals to see, because the animal's a good model of the human, and he could determine, well, based on the animal study, what do I look for in the human? Their argument is he relied exclusively on a flawed model. Incorrect. Incorrect. He did not rely exclusively on animal studies. As a matter of fact, what he did is he... No, no, no. On the record, on Dr. Lewis's analysis. He did not. He had the results of the genetic testing. He reviewed those results himself, and he was armed with that knowledge before he made his determination. But in addition to his animal study experience with Depakote, he did a world literature search, and what he did is he looked at... And he put together 118 scientific journals, and what he did is he said, well, what conditions do the world scientists say are caused by Depakote? What are the conditions that NK has, and do we have a match? And he found after that there was a match, and he cited to the magistrate below or in his report 118 specific articles on each and every phenotype or medical condition or birth defect that NK had. This is the furthest thing from junk science, and he's the furthest person from one who is not an expert in this field. Thank you. Thank you, Your Honors. Thank you very much, Mr. Fins. Mr. McCauley, both well argued, and we're grateful for the extra time that you gave us today.